UNITED STATES DISTRICT COURT                ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JEFFREY TOWNSEND,

                    Plaintiff,             MEMORANDUM AND ORDER

      -against-                             11-CV-801 (JG)

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
---------------------------------------------------------------x
A P P E A R A N C E S:

    LAW OFFICES OF HAROLD SKOVRONSKY
        1810 Avenue N
        Brooklyn, New York 11230
    By:    Harold Skovronsky
        Charles Weiser
        *Attorney for Plaintiff*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:    Tiana A. Demas
        Ryan Adams[1]
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Jeffrey Townsend seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the Commissioner of Social Security's denial of his applications for disability benefits. The parties have cross-moved for judgment on the pleadings, and I heard oral argument on August 5, 2011. Because the Commissioner's decision is supported by substantial evidence in the record, I grant his motion and deny Townsend's.

## BACKGROUND

---
[1] Mr. Adams, a student at the St. John's University School of Law, argued for the Commissioner with the consent of the parties.

On June 17, 2009, Townsend applied for supplemental security income, alleging that he had been disabled since December 2, 2004[2] as a result of physical impairments related to severe heart disease. His claim was denied on October 20, 2009. Townsend requested a hearing before an administrative law judge ("ALJ") at which he appeared and testified on August 11, 2010. R. 21-64. On September 3, 2010, ALJ Lori Romeo concluded that Townsend was not disabled within the meaning of the Social Security Act because he retained the residual functional capacity to perform the full range of light work with some environmental limitations as defined in 20 C.F.R. § 416.967(b). R. 11-17. The Appeals Council denied Townsend's request for review on January 6, 2011, thus making the ALJ's adverse decision the decision of the Commissioner. R. 1-5; *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

A.  *The Plaintiff's Statements and Testimony*

Townsend, a native New Yorker, is now 51 years old and has a high school diploma. Although Townsend lived with his sister and his nephew at the time of the hearing, he has four children from a previous marriage, as well as several other family members in the New York area. R. 35. He testified to seeing his two daughters twice a month, taking them to the park and playing with them. R. 36. However, he did not often see his grown sons. He socialized regularly with friends, R. 35, although he depended on family for rides because he could not easily use public transportation, R. 37.

Before he stopped working, Townsend was a maintenance worker. His duties required him to be on his feet and lift up to 30 pounds at a time. Prior to that job, Townsend worked for several years as a meat handler, putting raw meat through a grinder. That position also required him to be on his feet for the entire day, but did not involve significant lifting or carrying. R. 29-30.

---

2  At his hearing, Townsend corrected his alleged date of onset to January 1, 2009. R. 31.

Townsend testified before ALJ Romeo that he had not received any income other than food stamps and family assistance since January 1, 2009, and that he had been uninsured since August 2009. R. 31; *see* R. 47. However, later in his testimony, he stated that he had received unemployment benefits through April 2010, and had been insured by Medicaid at various times (though not continually) during the previous year. R. 31, 45.

With regard to his medical situation, Townsend testified that he could not sit for more than ten to fifteen minutes without becoming exhausted, nor could he stand for more than fifteen minutes without becoming nauseous. R. 31-32. He also testified that he could not walk for more than twenty minutes at a time. When asked how far he could walk in those twenty minutes, he responded that he could not walk more than two blocks during that time, and must rest periodically. R. 33-34. He described severe pain in his chest that occurred approximately twelve times per month and felt like punching or pinching. R. 51. He testified that he took aspirin as a blood thinner, and Elalapril and Lipitor for his blood pressure and cholesterol. He had previously taken Plavix as an anti-clotting medication. R. 38. He also testified that he had been prescribed nitroglycerin in the past, but that his doctors had "t[aken] him off" the medication within a few months. R. 37.[3]

During the hearing before ALJ Romeo, Townsend testified that he was being treated by various doctors at the SEL Medical Group ("SEL") about three times per month, and mentioned a specific visit in March 2010. However, he admitted after questioning that he had not been to SEL more than once in the eight months of 2010 prior to the hearing; that one visit, he stated, was on August 10, 2010 -- the day before the hearing before ALJ Romeo. He also testified that he had gone to the emergency room at Brookdale Hospital in March or April of

---

[3] Although there is support in the medical record for a possible diagnosis of depression, Townsend indicated in his testimony before ALJ Romeo that he was not seeking disability benefits for any mental health symptoms. R. 35. I therefore do not consider the psychological evidence contained in the medical record.

3

2010, but had not gone to the emergency room (or seen any other doctor) since that time. R. 49-50.

B.   *Medical Evidence*

   1.   *The Treating Records*

A series of tests performed by Dr. Joseph Dorsten at SEL between March 25 and April 1, 2009, reported no evidence of stenosis or deep vein thrombosis, but noted trace mitral regurgitation[4] and diastolic dysfunction[5] of the left ventricle due to impaired relaxation. Dorsten also noted that the estimated ejection fraction was 59%[6] and that the dimensions, structure, and strength of Townsend's heart were within normal limits. R. 243-47. A follow-up EKG performed on April 14, 2009 was deemed "abnormal" and suggested possible myocardial ischemia. R. 248.

A transcranial Doppler ultrasound examination performed on March 31 noted that Townsend's vasoreactivity, vessels of anterior circulation of the circle of Willis, and extracranial blood circulation were normal, but that there was likely atherosclerosis of his cerebral vessels. The report further detailed impressions of "[p]oor right temporal window (probably hyperostosis)" and "[a]bnormally increased resistance of cerebral vessels." R. 237. It also noted that the study was "technically difficult . . . due to poor right temporal window." *Id.*

On April 23, 2009, Dr. I. Jacobowitz, a cardiologist at SEL, completed a checklist form entitled "Treating Physician's Wellness P-lan Report." Jacobowitz reported current

---

[4] Mitral valve regurgitation occurs when the mitral valve of the heart does not close tightly, allowing blood to flow backward into the heart and causing tiredness and shortness of breath. *See* http://www.mayoclinic.com/health/mitral-valve-regurgitation/DS00421.
[5] Diastolic dysfunction refers to the stiffening of the ventricles of the heart and the resulting incomplete ventricular filling during the relaxation phase of the heart beat, resulting in blood collecting in the body's thoracic organs. *See* http://heartdisease.about.com/od/livingwithheartfailure/a/diastolic_HF.htm.
[6] The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. A normal ejection fraction is 55 to 70 percent. *See* http://www.mayoclinic.com/health/ejection-fraction/AN00360.

diagnoses of unstable angina, controlled hypertension, and hyperlipidemia, all of which were under active treatment. Under the section entitled "relevant clinical findings," he noted the "abnormal" results of the April 14 EKG and that Townsend had complained of chest pain radiating to his back and left arm. He noted that Townsend was prescribed Zocor, Plavix, and Imdur, and remarked that Townsend should continue his present therapy. He did not observe any significant improvement in Townsend's condition, and checked a box indicating that Townsend would be "[u]nable to work for at least 12 months. (may be eligible for long term disability benefits)." R. 264-65.

Townsend underwent a myocardial perfusion scan on May 5, 2009, which demonstrated positive exercise tolerance and good exercise capacity, but chest pain during stress and abnormal perfusion. The report, dated May 14, 2009, noted "evidence of a very small amount of stress induced ischemia involving the basal inferior wall" due to a "subtle mildly severe nearly completely reversible defect," and reported normal global systolic function with an ejection fraction of 61%. R. 242.

A biopsychosocial summary report from the Arbor WeCare center in Brooklyn, based upon a series of meetings with Townsend on May 19, 2009, noted that Townsend had what appeared to be symptoms of severe depression, and recommended immediate action. R. 221. The summary recorded a history of drug abuse and treatment (specifically, heroin), but noted that Townsend was compliant with treatment. R. 224. Townsend reported that he was able to travel independently, get dressed, and groom himself, and that he enjoyed bowling. R. 225; *see also* R. 226 (listing as a "strength" Townsend's ability to travel independently). He also reported being able to walk five or six blocks. R. 230. An EKG conducted by WeCare revealed "sinus rhythm, ? ischemia diffuse, leads." R. 227. Under the heading of "current medical conditions related to

5

employment as described by applicant/participant," the form lists merely "HTN [hypertension]." *Id.* The report attributed both the hypertension and his enlarged heart to his history of drug abuse. R. 229. It concluded that no functional capacity determination could be made until Townsend underwent a "complete cardiac evaluation and treatment" and created a wellness plan. R. 233.

On August 10, 2010, Dr. Jacobowitz filled out a form entitled "Medical Assessment of Ability to do Work-Related Activities." Although he stated that he had not seen Townsend since May 5, 2009, he described exertional limitations: specifically, he said Townsend was restricted to lifting ten pounds occasionally and less than ten pounds frequently, due to "abnormal EKG and positive exercise stress test," standing or walking for less than two hours, sitting for about six hours. R. 262; Pltf. Mot. App'x at 1. He was unable to evaluate whether Townsend was under any disability with respect to pulling and pushing. Apart from the positive stress test and abnormal EKG records, which Jacobowitz attached to his report, he included no medical documentation or written explanation supporting his exertional restrictions. However, he noted that "[d]ue to insurance problems [Townsend] didn't see me until now." R. 263. He recommended that Townsend undergo another stress test and follow up with a cardiologist for further treatment. *Id.*

2. *The Medical Expert*

Medical expert testimony was provided at the hearing by Dr. Richard J. Wagman, who had been previously provided with Townsend's medical records and who was present for Townsend's testimony during the hearing. R. 54. He expressed substantial doubts as to whether Townsend's medical conditions could be causing the symptoms and limitations of which Townsend complained. Specifically, he stated that Townsend's "chest pain . . . from his

description does not sound at all cardiac." R. 52. "Angina," he testified, "when someone gets it to the degree that he's claiming chest pain, you're in the emergency room. This is a terrifying experience." R. 56. Rather than the pinching pain described by Townsend, Wagman testified, a genuine cardiac patient would feel an intense pressure on his chest "like a ton of bricks," would have problems with his autonomic nervous system, and would begin to sweat profusely. R. 53. The frequency of the pain described by Townsend -- up to twelve times per month -- would also be "a medical emergency." *Id.* He concluded that Townsend's "description of his symptomotology [was] absolutely inconsistent," and that "[t]here's not a shred of evidence even remotely to corroborate [angina]." R. 55.

Dr. Wagman also noted that the medical records submitted by Dr. Jacobowitz and the Arbor WeCare clinic did not bear out the alleged severity of Townsend's symptoms. Townsend's medical records indicated that his heart function was within normal bounds: specifically, that his ejection fraction varied from 59% to 61%. He also noted that no doctor had undertaken the more drastic measures appropriate to such severe angina, such as a heart catheterization study, and that the doctors had taken Townsend off of nitroglycerin (a medication prescribed to patients with dangerous cardiac symptoms). R. 52-53. In his opinion, the slight stress-induced ischemia that had been found in one physical exam, even taken in the light most favorable to Townsend, was also "probably" too slight to prevent Townsend from working. R. 54-55. He specifically noted that Townsend's normal ejection fraction rate made the severity of the angina alleged by Townsend and Dr. Jacobowitz "highly doubtful." R. 57. He determined that the remainder of Townsend's medical tests had returned normal results, or results that bore such a wide margin for error that they were unreliable. R. 55. Accordingly, although he agreed

7

that Townsend could not work at heights or with moving machinery, he saw no other physical or mental restrictions on his ability to work. R. 54.

C. *Vocational Evidence*

Vocational expert testimony was provided at the hearing by Melissa Fass Karlin. She described Townsend's past work as a meat handler as a heavy, unskilled job, and his position as a cleaner as a medium, unskilled job. R. 59. Asked whether a hypothetical individual matching Townsend's description but who was limited only to light work could perform Townsend's past relevant work, she stated that he would not be able to. R. 61. However, she testified, such a person could perform other work available in the national economy: specifically, he could take positions as a cashier, counter attendant, order clerk, or surveillance systems monitor. R. 62-63. The expert also stated that an individual restricted to light, sedentary work with height and other environmental restrictions could still perform work as an order clerk or surveillance systems monitor. R. 62. Finally, when asked by ALJ Romeo whether an individual with the symptoms testified to by Townsend -- namely, an individual who "is only able to walk for 15 minutes at a time and stand for 10 minutes at a time and is suffering from extreme pain, which might actually prevent him from concentrating" -- could work at any job in the national economy, the expert replied that he could not. R. 62.

## DISCUSSION

A. *The Standard of Review*

To be found eligible for disability benefits, Townsend must show that, "by reason of [a] medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), he "is not only unable to do his previous work but cannot,

8

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[7] On review, the question presented is whether the Commissioner's decision to deny Townsend benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*per curiam*). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 31 (internal quotation marks omitted).

The Social Security regulations direct a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

---

[7] Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. *Id.* Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks omitted); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

B.   *Analysis*

The ALJ followed the five-step procedure outlined above. She determined that Townsend had not engaged in substantial gainful activity since the amended onset date and that he had "severe impairments" of hypertension, cardiovascular disease, angina, hyperlipidemia, and acid reflux, as well as a history of polysubstance abuse. R. 13. She determined that there was no severe medical impairment due to depression. R. 14. She found that none of Townsend's severe impairments met or medically equaled one of the listed impairments, and determined that he had the "residual functional capacity for the full range of light work activity." *Id.*; *see* 20 C.F.R. § 416.967(a) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."). The ALJ specifically found that Townsend was capable of performing light work, but was unable to perform his past relevant work, as it ranged from medium to heavy on the exertional scale. R. 16. At the fifth step, the ALJ concluded that Townsend was not disabled under the Social Security Act because he retained the residual functional capacity to perform light work with environmental limitations. R. 17.

In holding that Townsend was not disabled ALJ Romeo declined to give controlling weight to the opinion of Dr. Jacobowitz and instead credited the opinion of Dr. Wagman; she also made an adverse credibility determination with regard to Townsend's

subjective complaints of pain and disability. Townsend alleges that both of these decisions were erroneous. I find that the ALJ did not err on either point, and further find that the adverse decision of the Commissioner was supported by substantial evidence in the record.

    1.    *The ALJ Did Not Violate the Treating Physician Rule*

Under the Social Security regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well [] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight. He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

other relevant factors." *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

ALJ Romeo did not violate the treating physician rule when she discounted the opinion of Dr. Jacobowitz that Townsend was disabled from all work for at least the next twelve months, or his opinion regarding Townsend's exertional limitations. The ALJ was entitled to discount his opinion because there were no treatment notes to support the conclusions he made on the two checklists, and he made no reference to any physical examination that he or any other physician had conducted to determine Townsend's exertional limitations. *See* R. 15-16. The ALJ considered the record as a whole and determined that "the medical evidence" -- comprised of records of tests performed and evaluated entirely by other doctors, and upon which Jacobowitz seems to have substantially relied in completing both checklists -- was "scant for cardiovascular disease." *Id.* According to the record before ALJ Romeo, the evidence available to Jacobowitz when he completed both checklists was nearly identical to the evidence available to Dr. Wagner when he formulated his contrary opinion. ALJ Romeo was not required to give controlling weight to Jacobowitz's opinion.

    ii.    *The ALJ Properly Discredited Townsend's Testimony*

In resolving whether a plaintiff is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the plaintiff. The ALJ has discretion to evaluate a plaintiff's credibility, and "[i]f the ALJ's decision to ignore plaintiff's subjective complaints of pain is supported by substantial evidence, then this Court must uphold that determination." *Aronis v. Barnhart*, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003). However, the ALJ must set forth her reasons for discounting a plaintiff's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is

12

supported by substantial evidence." *Miller v. Barnhart*, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003). ALJ Romeo properly gave less credibility to Townsend's own statements, which conflicted within themselves even during the course of the hearing. R. 14-15.

Several factors undermined Townsend's credibility. His inconsistent statements about the frequency of his doctor's appointments and his admitted failure to seek medical attention between April and August of 2010[8] suggest a lack of credibility with regard to how serious he felt his symptoms were. His description of his pain did not comport with the typical symptoms experienced by angina patients. *See* R. 53.[9] Townsend's statements to Arbor WeCare also suggest that his exertional limitations were not nearly as severe as he alleged at his hearing: he admitted being able to take public transportation independently, being able to walk five or six blocks without a break, and that he enjoyed bowling. Importantly, Dr. Jacobowitz based his August 2010 form, which stated that Townsend was limited to less than two hours of walking in an eight-hour workday, on Townsend's record as of May 5, 2009 -- two weeks *before* Townsend's interview with Arbor WeCare. *See* R. 263. This further decreases the credibility of both Townsend and Jacobowitz. Finally, Townsend was twice offered the opportunity to submit to a consultative examination but missed both scheduled appointments. R. 256. Given the available evidence, ALJ Romeo's adverse credibility assessment was supported by substantial evidence and is therefore worthy of deference. *See Miller*, 2003 WL 749374, at *7.

---

8 Although Townsend blames a lack of insurance for his gap in treatment, he testified that he had been covered by Medicaid since July 2010 at the latest. *See* R. 47; *but see* R. 45 (testifying that he obtained Medicaid coverage in March of 2010).

9 Although Townsend argues that Dr. Wagman discounted his description of pain merely "because the description of the symptoms did not precisely match the doctor's own experience with angina," Pltf. Mem. at 4, this mischaracterizes Wagman's testimony. Wagman did not rely on his own symptoms, but merely noted that he could confirm that the known symptoms of angina were correct from his personal experience with the condition. R. 53.

3. *ALJ Romeo's Determination Was Supported by Substantial Evidence*

Dr. Wagman's opinion with regard to Townsend's exertional limitations was supported by the evidence in the record. As Wagman testified, the objective medical testing simply did not reliably show that Townsend's heart function was sufficiently impaired as to give rise to a finding of disability. R. 53-57. The only information in the record suggesting otherwise was Dr. Jacobowitz's unsupported opinion in the August 10, 2010 checklist, which as noted was justifiably discounted by ALJ Romeo, and Townsend's own statements, which ALJ Romeo properly found were less credible. Because Wagman's opinion was supported by the weight of the evidence, and Townsend's statements about the limiting effects of his symptoms were properly discounted, I find that ALJ Romeo properly determined that Townsend was not disabled.

## CONCLUSION

I conclude that the Commissioner's adverse decision is supported by substantial evidence in the record. The Commissioner's motion for judgment on the pleadings is therefore granted, and the plaintiff's cross-motion for judgment on the pleadings is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 16, 2011
      Brooklyn, New York